RICK E. ARBORIO, SR. *v.* WINDHAM POLICE
DEPARTMENT
(AC 28147)

Flynn, C. J., and Gruendel and Pellegrino, Js.

Argued May 22—officially released August 14, 2007

*Andrew J. Morrissey,* with whom, on the brief, was
*David J. Morrissey,* for the appellant (plaintiff).

*Henry J. Zaccardi,* with whom, on the brief, was
*Sheila A. Huddleston,* for the appellee (defendant).

*Opinion*

FLYNN, C. J. The plaintiff, Rick E. Arborio, Sr.,
appeals from the decision of the workers' compensation

review board (board) affirming the finding and dismissal of the workers' compensation commissioner (commissioner) in which the commissioner concluded that the plaintiff's claim for benefits under the Heart and Hypertension Act, General Statutes § 7-433c, was untimely.[1] We reverse the board's decision.

In this appeal, the plaintiff briefed three main issues: "[1] [w]hether a claim for hypertension benefits . . . must be filed within one year after the first manifestation of a symptom . . . [2] [w]hether a claim for hypertension benefits . . . should be considered an accidental injury [that] can be definitely located as to time and place or an accidental injury as the result of repetitive trauma or repetitive acts[2] [and] [3] [whether]

[1] "Claims under § 7-433c are governed by the procedures outlined in chapter 568 of the General Statutes, the Workers' Compensation Act, General Statutes § 31-275 et seq." *Hunt* v. *Naugatuck*, 273 Conn. 97, 99 n.1, 868 A.2d 54 (2005).

General Statutes § 7-433c (a) provides in relevant part: "Notwithstanding any provision of chapter 568 . . . in the event a uniformed member of a paid municipal fire department or a regular member of a paid municipal police department who successfully passed a physical examination on entry into such service, which examination failed to reveal any evidence of hypertension or heart disease, suffers . . . any condition or impairment of health caused by hypertension or heart disease resulting in his death or his temporary or permanent, total or partial disability, he or his dependents, as the case may be, shall receive from his municipal employer compensation and medical care in the same amount and the same manner as that provided under chapter 568 if such death or disability was caused by a personal injury which arose out of and in the course of his employment and was suffered in the line of duty and within the scope of his employment . . . ."

[2] On the plaintiff's form 30C, he checked the box claiming that his injury was due to "occupational disease or a repetitive trauma." On appeal, the plaintiff admits that he did not seek to establish an occupational disease, but he asserts that his claim for hypertension benefits should have been examined as a repetitive trauma injury as was indicated by his checking that box on his claim form. The commissioner considered the claim as one for accidental injury and never discussed repetitive trauma in his decision. Additionally, although the plaintiff argued before the board that his hypertension was due to repetitive trauma, it, also, did not address this argument in its decision. Because the issue of whether this claim for benefits properly should have been characterized as a repetitive trauma or an accidental injury is not pertinent to our conclusion that the commissioner's finding of a

the [plaintiff] need[s] to be disabled in order to file a claim for benefits under [§] 7-433c." The plaintiff poses these questions in light of our decision in *Pearce* v. *New Haven*, 76 Conn. App. 441, 819 A.2d 878, cert. denied, 264 Conn. 913, 826 A.2d 1155 (2003), which he claims changed the law on heart and hypertension claims, and he asks that *Pearce* be overturned. Although we do not agree that *Pearce* changed the law, we take this opportunity to discuss *Pearce* before analyzing the timeliness issue of the present case.

In *Pearce*, the record revealed the following facts: "On August 16, 1988, the plaintiff's blood pressure was taken three times [by his physician, Mark Kasper], with readings of 180 over 94, 178 over 104 and 156 over 94, respectively. . . . During 1988, Kasper also asked the plaintiff to report to him on a monthly basis in order to have his blood pressure checked. On June 1, July 12 and November 21, 1989, and January 11, June 12 and August 9, 1990, the plaintiff's blood pressure continued to be elevated with readings ranging from 140 over 98 to 170 over 110. . . . The plaintiff saw Kasper on a regular basis between 1988 and 1990, and Kasper discussed with the plaintiff his high blood pressure on nearly every visit. . . . The plaintiff did not see Kasper between 1990 and 1998, but, while at the Hospital of Saint Raphael in 1993, the plaintiff's blood pressure was

"potential hypertension problem" does not support the commissioner's legal conclusion of untimeliness, we, likewise, do not address this issue.

˙ In workers' compensation cases the distinction between an accidental injury and one caused by repetitive trauma could be very important to the timeliness of a claim for benefits. Accidental injuries, not the result of repetitive trauma, "are those injuries that may be definitely located as to the time when and the place where the accident occurred . . . ." (Internal quotation marks omitted.) *Russell* v. *Mystic Seaport Museum, Inc.*, 252 Conn. 596, 613, 748 A.2d 278 (2000). By contrast, "the process of injury from a repetitive trauma is ongoing until [the last date of exposure] . . . and, in many cases . . . the very nature of the injury will make it impossible to demarcate a specific date of injury." (Citation omitted; internal quotation marks omitted.) Id.

recorded at 172 over 100. Kasper wrote a letter to the plaintiff on October 17, 1995, requesting that he come to Kasper's office because Kasper was concerned about the plaintiff's blood pressure and cholesterol. Additionally, James Dougherty, a cardiologist, after reviewing the plaintiff's medical chart, concluded that there [was] extensive data in the record dating back to 1988, 1989 and 1990 where multiple blood pressure readings were obtained which clearly demonstrate modest, sustained essential hypertension. The plaintiff, however, was not diagnosed with hypertension until October 15, 1998 [and] [o]n November 13, 1998, the plaintiff filed a form 30C, claiming a date of injury of October 15, 1998." (Internal quotation marks omitted.) Id., 442–43. On the basis of these facts, the commissioner determined that the plaintiff's claim for benefits was untimely, and the board affirmed that decision. Id., 444. On appeal, we agreed with the board's affirmance of the commissioner's decision, concluding that because the plaintiff repeatedly had been informed by his physician that he consistently had elevated blood pressure readings during 1988, 1989 and 1990, he was required to inform his employer of his "injury." Id., 450.

The plaintiff in the present case claims that our holding in *Pearce* "confused occupational disease and repetitive trauma-accidental injury" by requiring a repetitive trauma-accidental injury claimant to file a claim for benefits at the first manifestation of a symptom of high blood pressure. This simply is not the case. First, it is important to note that in *Pearce*, the issue of repetitive trauma was not raised or addressed; rather, the commissioner addressed the hypertension as an accidental injury, not the result of repetitive trauma. We issued a decision in which we agreed with the commissioner that the plaintiff had a duty to notify his employer of his elevated blood pressure long before he actually notified it. We did not hold, nor did the commissioner or

board hold, that the plaintiff had a duty to notify his employer at the first "manifestation of a symptom." The claimant in *Pearce* repeatedly had been told, over a three year period, that his blood pressure was elevated, and, rather than address the issue, he chose to stop seeing his physician for the next eight years. Although the plaintiff had not been placed on medication for hypertension, we agreed with the commissioner's finding that the plaintiff knew of his hypertensive status during that three year period when he repeatedly had been counseled by his physician. Because so much time had passed between his elevated readings from 1988 through 1990 and the time at which he filed a claim in 1998, the commissioner did not make a factual finding as to the exact date on which the plaintiff was on notice of his injury, but we certainly did not read the commissioner's decision as indicating that the date of injury was the first day that the plaintiff had a high reading, nor did we so hold on appeal.

The plaintiff in the present case also claims that we changed the law in *Pearce* by stating that a claimant need not be disabled in order to file a claim for benefits under § 7-433c and that a claimant, if he is aware of his hypertensive status, must file a claim for benefits in order to put his employer on notice of his injury even before he is disabled.[3] Specifically, the plaintiff argues that *Pearce* "seems to state that [General Statutes] § 31-294b (first report of injury)[4] and [General Statutes] § 31-

---

[3] We note that "[w]hile the Workers' Compensation Act and [General Statutes] § 7-433c are separate pieces of legislation, [t]he procedure for determining recovery under . . . § 7-433c is the same as that outlined in chapter 568 [General Statutes § 31-275 et seq.] . . . . This includes compliance with the notice provisions of [General Statutes] § 31-294c. . . . Compliance with [§ 31-294c] is essential to maintaining a claim for compensation under chapter 568 and therefore under § 7-433c because timely notice is a jurisdictional requirement that cannot be waived." (Citations omitted; internal quotation marks omitted.) *Zaleta* v. *Fairfield*, 38 Conn. App. 1, 6, 658 A.2d 166, cert. denied, 234 Conn. 917, 661 A.2d 98 (1995).

[4] General Statutes § 31-294b provides: "Any employee who has sustained an injury in the course of his employment shall immediately report the injury

294c (notice of claim for compensation)[5] are somehow to be read together. . . . *Pearce* requires that a claim be filed before a claimant has met the prerequisites for filing such a claim. Why the disability portion of the statute is summarily eliminated is not explained at all. . . . Proof of a *disability* is a jurisdictional requirement. Without it, a claim fails." (Citations omitted; emphasis in original.). We affirm our holding in *Pearce* and do not agree with the plaintiff's statement that "[p]roof of a *disability* is a jurisdictional requirement [to filing a claim]." (Emphasis in original.) See generally *Hunt* v. *Naugatuck*, 273 Conn. 97, 105, 868 A.2d 54 (2005) ("[P]laintiff was not seeking an award of specific monetary benefits when he filed his notices [of claims] on March 26, 2001, and April 10, 2002, because his hypertension *had not ripened into a partial or total disability*. Rather, the plaintiff's motivation for filing the notices when he did was to bring his claim within the statute of limitations period and to alert his employer that he had developed a condition, namely, hypertension, that could spawn a claim for monetary benefits in the future." [Emphasis added.]). Certainly, proof of a disability is a prerequisite to the actual collection of benefits, but one need not be disabled before being required to notify one's employer of an accidental injury and to file a claim within one year of that injury.[6]

to his employer, or some person representing his employer. If the employee fails to report the injury immediately, the commissioner may reduce the award of compensation proportionately to any prejudice that he finds the employer has sustained by reason of the failure, provided the burden of proof with respect to such prejudice shall rest upon the employer."

[5] General Statutes § 31-294c (a) provides in relevant part: "No proceedings for compensation under the provisions of this chapter shall be maintained unless a written notice of claim for compensation is given within one year from the date of the accident or within three years from the first manifestation of a symptom of the occupational disease, as the case may be, which caused the personal injury . . . ."

[6] General Statutes § 31-275 (16) (A) provides: " 'Personal injury' or 'injury' includes, in addition to accidental injury that may be definitely located as to the time when and the place where the accident occurred, an injury to an employee that is causally connected with the employee's employment

See *Black* v. *London & Egazarian Associates, Inc.*, 30 Conn. App. 295, 303, 620 A.2d 176 ("[t]he purpose of [General Statutes] § 31-294 [notice of injury and of claim for compensation], in particular, is to alert the employer to the fact that a person has sustained an injury that *may be* compensable . . . and that such person is claiming *or proposes to claim* compensation under the [Workers' Compensation Act (act), General Statutes § 31-275 et seq.]" [citation omitted; emphasis added; internal quotation marks omitted]), cert. denied, 225 Conn. 916, 623 A.2d 1024 (1993); *Otero* v. *Bridgeport*, 13 Conn. Workers' Comp. Rev. Op. 248 (April 17, 1995) (employee injured back twice in 1986, notified employer of each injury, but did not file claim for benefits because not disabled; four years later, employee underwent back surgery due to 1986 injuries, filed claim; board held employee required to file form 30C within one year of injury; claim for benefits four years later ruled untimely).

When an employee sustains an accidental injury, defined in § 31-275 (16) as one "that may be definitely located as to the time when and the place where the accident occurred," he immediately must notify his employer of the accident pursuant to § 31-294b. If an employee fails to provide immediate notification, his award of benefits may be reduced if the employer can prove that it has been prejudiced by the failure to provide immediate notification. General Statutes § 31-294b. However, pursuant to § 31-294c (a), the employee not only must notify his employer of the accident, but he also must file a claim for benefits within one year of the date of the accident. Failure to file such a claim results in a jurisdictional bar, unless the failure to file a claim within one year of the date of the accident is

and is the direct result of repetitive trauma or repetitive acts incident to such employment, and occupational disease."

saved pursuant to one of the provisions found in § 31-294c (c).[7] See *Kuehl* v. *Z-Loda Systems Engineering*, 265 Conn. 525, 534, 829 A.2d 818 (2003) ("[i]t is well established, moreover, that a notice of claim or the satisfaction of one of the . . . exceptions [contained in § 31-294c (c)] is a prerequisite that conditions whether the commission[er] has subject matter jurisdiction under the [act]" [internal quotation marks omitted]).

The plaintiff claims that *Pearce* improperly "merged the *nonjurisdictional* requirements of § 31-294b with the *jurisdictional* requirement of § 31-294c." (Emphasis in original.) He argues that "[b]y its very language, failure to give prompt notice under § 31-294b may result in [a] reduction of benefits, but is not a *bar*." (Emphasis in original.) The plaintiff also focuses on the language of § 31-294c (c), which provides in relevant part: "No defect or inaccuracy of notice of claim shall bar maintenance of proceedings unless the employer shows that he was ignorant of the facts concerning the personal injury and was prejudiced by the defect or inaccuracy of the notice" and argues that "[s]hould the employer claim, and prove, any prejudice by not filing [a claim] based on symptoms, it could claim a reduction in benefits per §§ 31-294b and 31-294c (c)." We do not agree with this analysis.

---

[7] General Statutes § 31-294c (c) provides: "Failure to provide a notice of claim under subsection (a) of this section shall not bar maintenance of the proceedings if there has been a hearing or a written request for a hearing or an assignment for a hearing within a one-year period from the date of the accident or within a three-year period from the first manifestation of a symptom of the occupational disease, as the case may be, or if a voluntary agreement has been submitted within the applicable period, or if within the applicable period an employee has been furnished, for the injury with respect to which compensation is claimed, with medical or surgical care as provided in section 31-294d. No defect or inaccuracy of notice of claim shall bar maintenance of proceedings unless the employer shows that he was ignorant of the facts concerning the personal injury and was prejudiced by the defect or inaccuracy of the notice. Upon satisfactory showing of ignorance and prejudice, the employer shall receive allowance to the extent of the prejudice."

Although discussing a claim for survivor's benefits, our Supreme Court had the opportunity to discuss this particular provision of § 31-294c (c) in *Kuehl* v. *Z-Loda Systems Engineering*, supra, 265 Conn. 525. When making a claim for survivor's benefits, a dependent is required to file a written notice of claim for compensation with the deceased employee's employer or a workers' compensation commissioner within two years of the date of the deceased employee's accident or within one year of the deceased employee's death, whichever is later. General Statutes § 31-294c (a). In *Kuehl*, the plaintiff dependent never filed a formal notice of claim for survivor's benefits although she had requested and did receive a hearing. *Kuehl* v. *Z-Loda Systems Engineering*, supra, 530. After being denied benefits, the plaintiff appealed, claiming, in part, that her failure to file a timely claim for benefits was saved by § 31-294c (c). Our Supreme Court granted certification on the question of "[w]hether, based upon the facts, the [plaintiff] . . . should be precluded from pursuing a [survivor's] benefits claim under . . . [General Statutes] § 31-306 due to the fact that she did not file a formal notice of claim within the statute of limitations period established under . . . § 31-294c (a), which would have been one year from the date of [the decedent's] death—November 14, 1993." (Internal quotation marks omitted.) *Kuehl* v. *Z-Loda Systems Engineering*, supra, 530.

In analyzing the plaintiff's appeal, the court explained: "Public Acts 1913, c. 138, § 21, a precursor to § 31-294c (c), included a provision that '*no want*, defect, or inaccuracy of such notice and claim shall be a bar to the maintenance of proceedings unless the employer shall show that he was ignorant of the injury and was prejudiced by want, defect, or inaccuracy of notice.' . . . In *Schmidt* v. *O.K. Baking Co.*, 90 Conn.

217, 222–24, 96 A. 963 (1916), [the Supreme Court] interpreted 'want' of notice to mean the absence of notice. Thus, [its] rejection of the plaintiff's claim [was] buttressed by the fact that the legislature eliminated any reference to the absence of a notice of claim for compensation in the provision of § 31-294c (c) relating to defective or inaccurate notices." (Emphasis in original.) *Kuehl* v. *Z-Loda Systems Engineering*, supra, 265 Conn. 537–38. The Supreme Court further explained that the saving provision of § 31-294c (c) "addresses a 'defect or inaccuracy' in a notice of claim for compensation; it does not excuse, however, the *failure to file* a notice of claim." (Emphasis in original.) Id., 537. On this basis, we reject the plaintiff's argument in this case that untimely notice of a claim is saved by § 31-294c (c), absent a showing that the plaintiff is entitled to relief under an exception referenced in § 31-294c (c) that obviates the need for a claimant to file a notice of claim altogether.

The plaintiff also places much emphasis on the board's decision in *Stachelczyk* v. *Norwalk*, 1 Conn. Workers' Comp. Rev. Op. 51 (August 20, 1981), one of the first cases involving a claim for benefits under § 7-433c. The claimant in that case filed a notice of injury and a claim for benefits after being told that he had an irregular heartbeat although he was not disabled by the condition. Id. The plaintiff in the present case argues that the board determined the claim in *Stachelczyk* to be premature because there was no disability. Our own review of *Stachelczyk*, however, reveals that it is a case that particularly is on point with the present case and our reading of the statutes. In *Stachelczyk*, the claimant filed a notice of claim after being told he had an irregular heartbeat. Id. He did not claim to be disabled by the condition or to have any economic loss. Id. The commissioner dismissed the claim as premature, but the board reversed that dismissal, although it agreed that the

claimant had not met the prerequisites for the collection of benefits.[8] The board specifically held: "Since the four prerequisites demanded by the statute for inclusion in the group to be protected and for whom benefits are intended are not present in this claim, we find that no claim for benefits under [§] 7-433c has matured. Insofar as it is necessary to protect any future, maturing rights of the claimant, which may arise out of the heart condition diagnosed in or around October, 1977, we reverse the dismissal of the . . . [c]ommissioner and remand the matter . . . for such action as may be appropriate in the future." Id., 53. Under our reading of *Pearce*, as discussed herein, the procedures and the outcome of *Stachelczyk* precisely fit our analysis of what is required. The claimant filed his notice of injury and filed his notice of claim for benefits within one year of that injury. Because he was not claiming to be disabled at that point in time, his notice simply was "necessary to protect any future, maturing rights of the claimant, which may arise out of the heart condition . . . ." Id.

Now that we have clarified our holding in *Pearce*, we return to the merits of the present appeal by setting forth the undisputed facts, to which the parties had stipulated and which were found by the commissioner, along with the relevant procedural history, both of which are important to our consideration of this appeal. After passing a preemployment physical examination that disclosed no signs of hypertension or heart disease, the plaintiff began his employment with the defendant, the Windham police department, on July 27, 1987. The plaintiff had an office visit with Edward S. Sawicki, his

---

[8] "In order to collect the benefits provided by [General Statutes] § 7-433c, a claimant need show only that he or she is a uniformed member of a paid fire department or a regular member of a paid police department, whose preemployment physical examination revealed no evidence of hypertension or heart disease, who now suffers a condition or an impairment of health caused by hypertension or heart disease that has resulted in death or disability, and has suffered a resultant economic loss." *Zaleta* v. *Fairfield*, 38 Conn. App. 1, 5, 658 A.2d 166, cert. denied, 234 Conn. 917, 661 A.2d 98 (1995).

treating physician, on December 23, 1997, at which he had a blood pressure reading of 150 over 86, which Sawicki indicated was not alarming. When the plaintiff next visited Sawicki on April 17, 2000, his blood pressure readings were 146 over 90 and 140 over 94, and Sawicki noted the words "labile hypertension"[9] on the plaintiff's chart. During a deposition related to this case, Sawicki testified that at the time of the April 17, 2000 office visit, the plaintiff was age fifty-one, two blood pressure checks done in the office had been "above 90," the plaintiff's cholesterol was high in 1998 and, because of the increasing risk to his health, consideration was given to the "potential need to address the blood pressure readings with medication, and the [plaintiff] was told to obtain a blood pressure monitor to check his blood pressure at home." On May 17, 2001, the plaintiff had a blood pressure reading of 140 over 100 at another office visit with Sawicki, who made another chart notation of "labile hypertension" and also noted that the plaintiff had an outside reading of 130 over 90. Sawicki, at this time, became more serious about the possibility of having to treat the plaintiff's blood pressure. Sawicki ordered a stress test and requested that the plaintiff monitor his blood pressure at home and report back to him in a few weeks. The stress test showed that the plaintiff had a "hypertensive response." Sawicki began to monitor the plaintiff's blood pressure more closely after a May 30, 2002 office visit, and, on December 10, 2002, Sawicki indicated that the plaintiff had a "white coat" hypertensive pattern.[10] On January

[9] Harvard Medical School's Consumer Health Information, which can be found at http://www.InteliHealth.com (last visited June 7, 2007), explains that "[l]abile hypertension is blood pressure that fluctuates abruptly and repeatedly, often causing symptoms such as headache or ringing in the ears. People with labile hypertension often react to emotional stress with an increase in blood pressure."

[10] Harvard Medical School's Consumer Health Information, located at http://www.InteliHealth.com (last visited June 7, 2007), explains: "Anxiety can raise blood pressure. That's why some people who have a normal blood pressure at home find that their blood pressure is high when they see a

23, 2003, Sawicki placed the plaintiff on medication to control his blood pressure. The plaintiff filed a form 30C notice of claim for compensation for hypertension, citing a date of injury of January 23, 2003. On May 5, 2003, the defendant filed a form 43 contesting the timeliness of the plaintiff's claim.

On the basis of these stipulated facts, which the commissioner incorporated into his written October 5, 2005 decision, the following additional findings and conclusions were issued: "(A) The [plaintiff] was a regular member of a paid municipal police department who successfully passed a physical examination on entry into service on July 27, 1987, which examination failed to reveal any evidence of hypertension or heart disease. (B) The testimony of . . . Sawicki is found to be the more credible testimony. (C) As a result of the office visits of April 17, 2000, and May 17, 2001, which resulted in the scheduling of a stress test, the [plaintiff] was aware [that] he had elevated blood pressure and that he had a potential hypertension problem that may require medication. (D) The [plaintiff] did not file a notice of injury until April 21, 2003, despite having been informed by his physician that he had elevated blood pressure readings and had a potential problem [that] may require medication to control. (E) The [plaintiff's] claim for benefits pursuant to § 7-433c . . . is untimely, and the workers' compensation commission lacks subject matter jurisdiction to consider the claim." The commissioner then held that "[t]he [plaintiff's] claim for hypertension [benefits] pursuant to § 7-433c . . . is *denied* and *dismissed*." (Emphasis in original.)

The plaintiff then filed a petition for review with the board, which affirmed the finding and dismissal of the

doctor. This phenomenon is called 'white-coat hypertension.' " See also *Pearce* v. *New Haven*, supra, 76 Conn. App. 442 n.1 (" 'white coat hypertension' results from someone becoming anxious because of an office visit, causing his or her blood pressure to increase").

commissioner. Specifically, the board held that "the trial commissioner's findings reflect a number of instances where [the plaintiff's] blood pressure was elevated. [The plaintiff's] physician encouraged the [plaintiff] to monitor his blood pressure at home. These findings, along with the other findings set out in the finding and dismissal support the [commissioner's] conclusion." This appeal followed.

On appeal, the plaintiff claims that even if his hypertension was the result of an accidental injury, not caused by repetitive trauma, the board improperly affirmed the commissioner's determination that his claim for benefits was untimely. On the basis of the facts specifically found by the commissioner and accepted by the board, we conclude that the commissioner's determination that the plaintiff's claim was untimely is not supported by the commissioner's factual findings.

We set forth the applicable standard of review in this workers' compensation appeal. "Filing a notice of claim or . . . satisfaction of one of the . . . exceptions [contained in § 31-294c (c)] is a prerequisite that conditions whether the commission[er] has subject matter jurisdiction under the [act]." (Internal quotation marks omitted.) *Estate of Doe* v. *Dept. of Correction*, 268 Conn. 753, 757, 848 A.2d 378 (2004). Our Supreme Court has emphasized that "[c]ompliance with [§ 31-294c] is essential to maintaining a claim for compensation under [the act] and therefore under . . . § 7-433c . . . because timely notice is a jurisdictional requirement that cannot be waived." (Internal quotation marks omitted.) *Malchik* v. *Division of Criminal Justice*, 266 Conn. 728, 739, 835 A.2d 940 (2003). "[B]ecause [a] determination regarding . . . subject matter jurisdiction is a question of law, our review is plenary." (Internal quotation marks omitted.) *Estate of Doe* v. *Dept. of Correction*, supra, 757. Nevertheless, "[t]he power and duty of determining the facts rests on the commissioner,

who is the trier of fact. . . . [The] authority to find the facts entitles the commissioner to determine the weight of the evidence presented . . . . On review, the commissioner's conclusions must stand unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them." (Citations omitted; internal quotation marks omitted.) *Funaioli* v. *New London*, 52 Conn. App. 194, 197, 726 A.2d 626 (1999).

In this case, the commissioner made certain findings on the basis of the evidence presented and the stipulations of the parties. To support his legal conclusion that the commission lacked subject matter jurisdiction because the plaintiff's claim was not timely, he made the specific findings that "[a]s a result of the office visits of April 17, 2000, and May 17, 2001, which resulted in the scheduling of a stress test, the [plaintiff] was aware [that] he had elevated blood pressure and that he had a potential hypertension problem that may require medication . . . . The [plaintiff] did not file a notice of injury until April 21, 2003, despite having been informed by his physician that he had elevated blood pressure readings and had a potential problem [that] may require medication to control." It is on the basis of these particular findings that the commissioner concluded that the commission was without subject matter jurisdiction because the plaintiff's claim was untimely.

In the board's decision in *Pearce*, it explained: "The trier [has] considerable discretion to decide whether the [employee's] blood pressure readings . . . [constitute] evidence of hypertension, rather than temporary symptoms of elevated pressure due to other stressors. . . . [W]e do not believe that § 7-433c was intended to cover every temporary instance of raised blood pressure that is brought on by a transitory illness or injury. We have

also stated that there is no particular systolic or diastolic pressure reading that constitutes a legal hypertension line in this state. . . . It is up to the trial commissioner to assess the significance of such a reading within the complete factual framework of the case before [her]. . . . Similarly, medical treatment of high blood pressure may or may not be indicative of hypertension, depending on the circumstances." (Citations omitted; internal quotation marks omitted.) *Pearce* v. *New Haven*, No. 4385 CRB-03-01-5 (March 28, 2002). We agree with this reasoning.

Nevertheless, in this present case, the commissioner's findings of fact, which we agree are supported by the record, do not support the legal conclusion that the commission lacked subject matter jurisdiction. Two office visits showing high blood pressure readings, a stress test and an employee's awareness of those elevated readings and awareness that "he had a potential hypertension problem that may require medication" simply are not sufficient to support the conclusion that the plaintiff had an accidental injury that required him to notify his employer and to file a claim for benefits. The commissioner did not find that the plaintiff had hypertension but only that he had a *potential hypertension problem*. When an employee has an accidental injury, he is obligated to notify his employer and to file a claim for benefits within one year of that accidental injury. See General Statutes §§ 31-294b and 31-294c. This is true even when the employee is not seeking immediate benefits but simply is seeking to preserve his right to future benefits. See *Stachelczyk* v. *Norwalk*, supra, 1 Conn. Workers' Comp. Rev. Op. 51. The employee, however, must have had some type of accidental injury (not necessarily an immediately disabling injury) before being required to file a claim. Unlike the factual record in *Pearce* v. *New Haven*, supra, No. 4385 CRB-03-01-5, under the thin facts of this case, the mere

awareness of some "potential problem" that might, one day, require medication simply cannot be enough to trigger the notice of claim provision.

Accordingly, on the basis of the facts found by the commissioner, and affirmed by the board, we conclude that the commissioner improperly concluded that the commission lacked jurisdiction.

The decision of the workers' compensation review board is reversed and the case is remanded with direction to reverse the determination of the commissioner and to remand the case to the commissioner for further proceedings in accordance with law.

In this opinion the other judges concurred.